UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DELLA DAVIS,

        Plaintiff,

                                     Case No. 11-CV-13688

v.

                                   HON. GEORGE CARAM STEEH

THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

        Defendant.
_____/

ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT
ON THE RECORD (#26) AND GRANTING PLAINTIFF'S
MOTION FOR JUDGMENT ON THE RECORD (#20)

       This case involves a claim by Plaintiff, Della Davis, that Defendant Prudential

Insurance Company of America wrongfully terminated her long-term disability benefits

and determined she was no longer eligible for continued waiver of premium benefits

under an employee benefit plan governed by the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.  The parties filed cross motions for

judgment on the administrative record, which are presently before the court.  The

motions are fully briefed and the court finds that oral argument is not necessary.  See

Local Rule 7.1(f).  For the reasons set forth below, the court DENIES Defendant's

motion for judgment on the record and GRANTS Plaintiff's motion for judgment on the

record.

<u>FACTUAL BACKGROUND</u>

Plaintiff's long-term disability benefits were provided through a plan sponsored by Detroit Area Agency on Aging ("DAAA") and insured by Prudential under group contract number G-94745 (the "Plan").   (D001120; D001157.)   Under the terms of the Plan, participants are entitled to long-term disability ("LTD") benefits when "Prudential determines" that:

> • you are unable to perform the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**; and

> • you have a 20% or more loss in your **indexed monthly earnings** due to that **sickness** or **injury**.

> After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury you are unable to perform the duties of any **gainful occupation** for which you are reasonably fitted by education, training or experience.

> The loss of a professional or occupational license or certification does not, in itself, constitute disability.

> We may require you to be examined by doctors, other medical practitioners or vocational experts of our choice.   Prudential will pay for these examinations.  We can require examinations as often as it is reasonable to do so. We may also require you to be interviewed by an authorized Prudential Representative.  Refusal to be examined or interviewed may result in denial or termination of your claim.   **Material and substantial duties** means duties that:

> • are normally required for the performance of your regular occupation; and

> • cannot be reasonably omitted or modified … .

> **Regular occupation** means the occupation you are routinely performing when your disability begins. Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.

-2-

*Gainful occupation* means an occupation, including self employment, that is or can be expected to provide you with an income equal to at least 60% of your indexed monthly earnings within 12 months of your return to work. (D1178-79.)

The Plan provides further:

**What Disabilities Have a Limited Pay Period Under Your Plan?**
Disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on *self-reported symptoms* have a limited pay period during your lifetime.

Disabilities which, as determined by Prudential, are due in whole or part to *mental illness* also have a limited pay period during your lifetime.

The limited pay period for self-reported symptoms and mental illness combined is 24 months during your lifetime.

\* \* \*

*Self-reported symptoms* means the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

*Mental illness* means a psychiatric or psychological condition regardless of cause. Mental illness includes but is not limited to schizophrenia, depression, manic depressive or bipolar illness, anxiety, somatization, substance related disorders and/or adjustment disorders or other conditions. … (D001186-87.)

The life insurance plan includes a provision that states "your death benefit protection will be extended while you are Totally Disabled. … You are "Totally Disabled" when: (1) You are not working at any job for wage or profit; and (2) Due to Sickness, Injury or both, you are not able to perform for wage or profit, the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience. … Your extension protection ends if and when: (1) Your Total Disability ends; or … (3) You fail to furnish any required proof that your Total Disability continues … ." (D001214-15.)

-3-

Plaintiff worked at DAAA as a Pre-Screener and went out of work on March 23, 2006, due to diagnoses of Carpal Tunnel Syndrome, Cervical Disc Disease, Depression and Anxiety. (D001116.)  Dr. Rottenberg's notes indicate that pain, fatigue, and numbness caused Plaintiff to stop working.  (D000883.)

Short-term disability ("STD") benefits were fully paid; and on September 8, 2006, LTD benefits were approved effective September 19, 2006.  (D001098; D00973.)

Plaintiff had a consultation with Dr. John L. Zinkle, Neuro and Spine Surgeon, on September 29, 2006.  (D00224.)  Plaintiff's chief complaint was pain from the back of the head down to between the shoulder blades and up to both shoulders. (D00224.) Dr. Zinkle diagnosed severe cervical/cervicothoracic myofascial pain.  (D00227.)  He discarded surgery and recommended non-surgical interventions including massage therapy, central acting medications and possibly physical therapy. (*Id.*)

Plaintiff was seen at Tri-County Pain Consultants, PC on January 29, 2007. (D00740.)  The diagnostic impression states somatic dysfunction of the cervical spine, right cervical radiculopathy, degenerative disc disease and spondylosis of the cervical spine and foraminal stenosis and depression.  (D00741.)  Plaintiff received trigger point injections. (*Id.*)  Plaintiff returned to Tri-County Pain Consultants on February 13, 2007.  (D00674.) Her pain level was noted as 7/10, and she received a cervical epidural steroid injection. (D00676.)  Plaintiff returned to Tri-County Pain Consultants on February 22, 2007 and reported no significant relief from the epidural injection and having flared up pain on the left side of her neck.  (D00677.)  Her pain level was reported to be 7/10.  (*Id.*)

Plaintiff underwent physical therapy at Team Rehabilitation. (D00661.)  The plan of care dated March 8, 2007, indicates Plaintiff reported her pain level at the lower cervical

spine and back was 6/10 at rest and 9/10 with activity. (*Id.*)  On March 14, 2007, Plaintiff returned to Tri-County Pain Consultants. (D00679.)  She continued to report constant and aching pain in her neck radiating to both shoulders and into her right arm.  Her pain level was reported to be 9/10.  (*Id.*)  Consultation with a spine surgeon was recommended.

On March 19, 2007, Plaintiff's pain level was 8/10. (D00681.)  She reported her pain and overall functioning was worse than before, and not feeling relief from the prior injection. She was referred to undergo another MRI of the cervical spine to be to rule out spinal stenosis.  Plaintiff had a diagnostic right intraarticular shoulder injection under fluoroscopic guidance with sedation; bilateral C3-4, C4-5 and C5-6 facet joint injections under fluoroscopic guidance with sedation procedures and trigger point injections in the right infaspinatus and deltoid muscles by Dr. Dobritt. (D00680.)  Plaintiff was discharged by Dr. Dobritt from physical therapy on March 27, 2007, after she had reached the maximum level. (D00230.)

Plaintiff returned to Tri-County Pain Consultants on April 11, 2007. (D00682.)  She reported significant relief from the procedures done by Dr. Dobritt the prior month (shoulder injection).  She reported intermittent pain in the neck with very little radiation down to her right arm and an improvement in her overall functioning.  She reported further the pain would get worse with prolonged sitting.  However, she reported she was not experiencing the constant, horrible aching in the shoulders that she did before treatment.  She reported that her pain had been relieved 20-40% during the treatment.

On May 9, 2007, the average pain level over the prior month was described as 5/10. (D00683.)  Plaintiff reported that her pain increased with prolonged sitting.  She also reported that pain and numbness in her right arm was returning since her last treatment.

She reported suffering from the side effects of severe drowsiness and mental fogginess at times.

On May 18, 2007, Plaintiff had an MRI of the cervical spine, which corroborated degenerative disc disease at multiple levels, without significant stenosis but with neural foraminal narrowing.  (D00668-69.)

Plaintiff returned to the Tri-County Pain Consultants on June 7, 2007.  (D00684.) She reported good relief from the injection she received.  She indicated she was in a car accident weeks before which had (re-)aggravated her neck condition.  Her pain was described worse when she sat down.  The level was noted to be 7/10.  (*Id.*)  She had bilateral cervical facet blocks C2-3 to C4-5 under fluoroscopy, as well as trigger point injections in the bilateral trapezius and rhomboid muscle that day. (D00687.)

Plaintiff had a sleep study on June 22, 2007, which showed she had a moderate case of obstructive sleep apnea.  (D00232.)  An EKG channel showed normal sinus rhythm and no periodic limb movements.  (*Id.*)  The study recommended a CPAP and weight reduction.  (*Id.*)

On July 5, 2007, Plaintiff returned to Tri-County Pain Consultants for a follow up visit. (D00688.)  She reported no significant relief from the prior procedure and a pain level of 7/10.  (*Id.*)  The note documents Plaintiff was experiencing severe drowsiness, moderate sweating and mental forgetfulness as side effects from her medication.  (*Id.*)  On August 7, 2007, she returned to Tri-County Pain Consultants and rated her pain at 9/10, but indicated it had been averaging 6/10 recently.  (D00689.)  On September 11, 2007, Plaintiff's pain level was noted to be 7/10.  (D00668.)  Plaintiff continued to report drowsiness and was prescribed methadone.  (*Id.*)

On August 14, 2007, Dr. Dobritt authorized Plaintiff to undergo a Functional Capacity Evaluation ("FCE"). (D00704.) Dr. Dobritt authored a letter to Prudential on September 19, 2007, indicating he acted prematurely in authorizing the FCE and concluded that test was not necessary to assess a patient who is already disabled from all work. (D00233.) Dr. Dobritt stated Plaintiff was unable to perform any work activities due to cervical disk disease, with herniated disks; spondylosis; thoracic outlet syndrome, which produced severe pain, aggravated by sitting more than 15 minutes at a time and only relieved by lying down several times during the day; the sedative effect of her narcotic medication, which impaired mobility, coordination and brain function; the pain, weakness and numbness produced by her diagnoses of cervical radiculopathy and carpal tunnel syndrome; and the fatigue from the fibromyalgia and sleep apnea. (*Id.*)

On October 2, 2007, Plaintiff reported not getting significant relief from the methadone alone and had to take Vicodin to deal with her pain. (D00659.) Her pain was 8/10. (*Id.*)

On November 13, 2007, Prudential conducted a vocational rehabilitation assessment of Plaintiff's position, as it would be normally performed. (D00957.) The assessment concluded the position required making decisions and judgments; the ability to lift/carry, push/pull up to 10 pounds occasionally, or negligible amounts constantly; would be typically performed from a seated position; may require brief periods of time standing and walking during the workday; and frequent reaching, handling, hearing, near acuity and occasional finger usage. (D00958.)

Plaintiff returned to Tri-County Pain Consultants on November 13, 2007, with pain complaints. (D00234-35.) She reported her overall function to be worse and adverse side

-7-

effects from her medication including mild nausea, mild itching, moderate sweating, severe drowsiness and moderate mental forgetfulness.  Injections were recommended for her carpal tunnel syndrome and an updated EMG of both upper extremities.  On November 27, 2007, Plaintiff reported her carpal tunnel syndrome improved after the injection.  (D00236.)  Her pain level was listed at 6/10.  (*Id.*)  She indicated she needed to take frequent naps during the day to be more alert.

Plaintiff attended an Independent Medical Examination ("IME") with Dr. Lawrence R. Blaty, Physical Medicine and Rehabilitation physician, on January 15, 2008, as requested by Prudential.  (D00640.)  Her main complaint was noted to be neck pain radiating into the upper shoulders and right upper extremity, as well as side effects from her medications.  (D00640-41.)  Dr. Blaty's impression included subjective complaints of neck pain, shoulder and upper back pain, migraine headaches, right upper extremity pain, knee arthritis, tremor, generalized weakness and anxiety.  (D00646.)  Dr. Blaty's physical examination was unremarkable showing no focal sensory loss or deficit, and good mobility. (*Id.*)  He concluded further Plaintiff demonstrated findings of "mood, anxiety, and somatoform disorder on prime MD testing with office screening."  (D00647-48.)  He believed Plaintiff had no focal functional impairment at that time notwithstanding the findings of arthritis at the cervical level.  (*Id.*)  He opined Plaintiff's self-reported symptoms were inconsistent with his findings.  (D00647.)  Due to her cervical spondylosis, Dr. Blaty recommended the following permanent restrictions and limitations: "avoid repetitive overhead reaching and overhead activities with the upper extremities …[and] avoid heavy lifting more than 40 pounds."  (*Id.*)  He opined further that, due to Plaintiff's treatment with methadone, she had some impaired thought process.  (D00647; D00649.)  However, the

-8-

physician also indicated Plaintiff presented to his office and acted without any apparent confusion. (D00649.) He clarified that despite the use of methadone, he felt Plaintiff was "able to function quite well even cognitively without any noticeable confusion that would have impaired her function." (*Id.*)

Plaintiff returned to Tri-County Pain Consultants on January 17, 2008. (D00160.) Her pain level was 8/10. Plaintiff was referred to a behavioral pain management physician. (*Id.*)

On February 19, 2008, Plaintiff reported the methadone was working well, but complained of sedation and mental forgetfulness. (D00161.) She also stated the CPAP machine prescribed for her sleep apnea was not working because she breathed through the mouth. (*Id.*)

Prudential terminated Plaintiff's benefits effective February 29, 2008, by letter dated February 25, 2008. (D001074.) Prudential indicated in its communication that the IME showed no objective findings, including those pertaining to the physical examination, to support Plaintiff's inability to perform relevant work activities. (D001075.)

Further, on February 29, 2008, Prudential determined Plaintiff was no longer eligible for continued waiver of premium benefits since the information in the administrative record showed she possessed the functional capacity to perform the duties of her own occupation and no longer satisfied the group policy requirements to receive said benefit. (D0037; D0039.)

On March 18, 2008, Plaintiff returned to Tri-County Pain Consultants. (D00158.) Plaintiff reported a pain level of 7/10. She reported further her trial with morphine increased

her pain, severe nausea and generalized feeling of unwellness and wanted to go back to methadone.

Plaintiff returned to the Tri-County Pain Consultants on April 16, 2008.  (D00157.)  She complained of pain in her right shoulder and rated it at 6/10.  (*Id.*)  The impression states she had tendonitis in her right shoulder and was referred to an orthopedic surgeon, who specialized in shoulders, for further evaluation.

On May 13, 2008, she stated the pain in her right shoulder was worsening.  (D00156.)  She was referred by her primary physician to have an ultrasound of her right shoulder.

On June 10, 2008, Plaintiff continued to report neck pain radiating to the right shoulder and down the right arm and rated it 6/10.  (D00242.)  She indicated that 60% of her pain was being relieved by the present treatment.  (*Id.*)

Plaintiff had an MRI of the cervical spine on June 17, 2008.  (D00243.)  The impression showed "cervical degenerative changes C3-4, C4-5, C5-6 and C6-7 with resultant foraminal narrowing as above, however, lateralizing disc herniations or spinal cord compression is not confirmed … Straightening of the normal cervical lordosis and mild osteopenia."  (D00243.)

Plaintiff had an MRI of the right shoulder on August 21, 2008, which showed "increased signal intensity within the infraspinatis tendon in keeping mild tendinopathy.  A full thickness tear is not seen. …There is a 5 mm cystic structure adjacent to the anterior glenoid which may represent a small paralaral cyst.  I cannot exclude the possibility of a subtle tear of the anterior glenoid labrum.  If clinically warranted, shoulder arthrogram with MRI may be helpful for further assessment."  (D00245-46.)

On October 1, 2008, Plaintiff sent a letter to Prudential related to the termination of LTD benefits effective February 29, 2008 and discontinuance of the waiver of life insurance premium benefits. (D0015.) Plaintiff stated she had been ill, had had two surgeries and was scheduled to have a third one in her right shoulder on October 6, 2008. (*Id.*) Therefore, she had been unable to appeal the decision. She also requested information to have the life insurance benefit reinstated. (*Id.*) This was treated as a request for extension to file an appeal. (D001072.)

Dr. Jerome Ciullo, Orthopedic Surgeon, performed surgery on Plaintiff's right shoulder on October 6, 2008. (D00150.)

On November 12, 2008, Plaintiff appealed the termination of benefits. (D00210.) She largely contested the results of Dr. Blaty's IME. (D00212.)

Plaintiff's surveillance was conducted on November 18-20, 2008. (D00565.) On the 18th she was observed driving and on the 20th observed driving, grocery shopping, carrying packages, and entering and exiting her vehicle. (D00568-70.)

Prudential commissioned an independent medical review of Plaintiff's records by Dr. Glenn Kalash, Board Certified in Psychiatry. (D00208.) The report is dated December 2, 2008. Dr. Kalash opined Plaintiff had mildly severe psychological impairment (distress over chronic pain) and mildly severe cognitive impairment (due to narcotic/sedative medications) from March 31, 2006 forward. (D00201.) He opined Plaintiff could have slowed mentation and tiredness due to her use of chronic opioids and that was the reason she had benefitted from taking Provigil. (*Id.*) He did not believe either Plaintiff's reported anxiety or depression was functionally impairing. (D00202.) Dr. Kalash did opine Plaintiff should be permitted, as restrictions and limitations, flexibility in her work hours, a later start time if her sleep was

disturbed at times, as well as brief rest breaks during the day or an extended break to allow a brief nap.  (D00202.)  These restrictions were noted to be temporary, during the period she takes opioids and sedative medications.  (*Id.*)  He concluded Plaintiff's medical records did not indicate significant impairments, all her complaints were subjective and have not been evidenced during clinical encounters.  (*Id.*)  Dr. Kalash stated there had been an absence in Plaintiff's psychological treatment from a non-pharmaceutical approach, including weekly therapy sessions to address her subjective anxiety, depression, somatic symptoms, chronic pain and possible symptom magnification. (D00203.)

On December 10, 2008, Prudential determined Plaintiff was eligible for additional LTD benefits and, therefore, reinstated her LTD benefits.  (D001061.)

Independent peer reviewer Dr. Popovich opined Plaintiff had a functional impairment due to her right surgery for a closed period from October 6, 2008 through December 1, 2008.  (D00206.)  The restrictions and limitations imposed during this period included the inability to use her right upper extremity above chest level.  (*Id.*)  He concluded, however, the other records provided did not offer objective medical findings in support of any other inability to sustain activity.  (*Id.*)  Dr. Popovich stated the record showed Plaintiff's right hand numbness was consistent with the results of her electrodiagnostic testing, which confirmed carpal tunnel syndrome.  (D00207.)  Moreover, her complaint of right shoulder pain was consistent with findings of adhesive capsulites, Grade 1 slap lesion, subcrominal impingement and AC joint arthritis.  (*Id.*)  Dr. Popovich opined the medical records did not support adverse side effects from medications or combination of medications.  (*Id.*)

On December 10, 2008, Prudential determined Plaintiff was eligible for additional LTD benefits and, therefore, reinstated her LTD benefits.  (D001061.)

On December 16, 2008, Dr. Ciullo referred Plaintiff to physical therapy concerning her shoulder 3 times per week for 8-12 weeks. (D00505.) He indicated Plaintiff was unable to lift above her mid-chest level for 10-12 weeks. (D00506.)

On January 8, 2009, Plaintiff requested the continuation of life insurance benefit be granted in light of Prudential's reinstatement of LTD benefits in its December 10, 2008 letter. (D0011; D0014.)

Plaintiff had a Neuro-Diagnostic Study on February 10, 2009, which showed bilateral, median mononeuropathy (carpal tunnel syndrome) at the wrists, mild sensory of the left and moderate sensorimotor on the right side. (D00145.) There was no evidence on denervation/radiculopathy or large-fiber polyneuropathy in the examined limbs. (*Id.*)

Plaintiff filled out an Activities of Daily Living Questionnaire on February 17, 2009. (D00166-72.) She described her current conditions as cervical disk disease, fibromyalgia, thoracic outlet syndrome, carpal tunnel syndrome, sleep apnea, radiculopathy, chronic fatigue syndrome, confusion, blurred vision, progression of cervical disease and side effects from narcotics. (D00166.) Plaintiff reported waking up every hour at night due to sleep apnea and that the device recommended was unsuccessful; needing help in doing her hair if her carpal tunnel syndrome was severe; having issues with her memory; not driving very far due to blurred vision, pain in the neck and shoulders. (*Id.*) Plaintiff stated further she could not drive more than 30 minutes because sitting too long is painful. (D00169.) She was able to vacuum, do dishes, make her bed, dust, do laundry, mop, and take care of trash. (D00170.) Also, during the summer, she was able to pull weeds and plant flowers for 15 minutes a couple of times a week. (*Id.*) She stated she was able to

shop for food weekly with assistance but felt the bags were too heavy and she needed assistance with the bags and loading. (*Id.*)

Prudential scheduled a second IME, this one with Dr. Brian Roth, Board Certified in Physical Medicine and Rehabilitation. (D00454.) His report is dated July 9, 2009. (*Id.*) The impression of this examination reveals Plaintiff reported neck, shoulder and low back pain and reported numbness in both hands; cervical degenerative disease with disc herniation; and possible greater right than left carpal tunnel syndrome without atrophy. (D00457.) The physical examination showed Plaintiff could ambulate without difficulty and had only a slight limitation in her cervical and lumbar spine. (D00456.) Dr. Roth believed there was no medical evidence that Plaintiff had a limitation in her functioning and, therefore, no restrictions and limitations were imposed. (D00457.) Dr. Roth recommended weaning off the narcotic medications. (*Id.*) Dr. Roth noted that Plaintiff "is not a very good historian and has difficulty recalling recent events" but also found she "has good communication and cognition skills." (D00456; D00459.) He also concluded, based on his physical examination, Plaintiff exhibited no significant muscle weaknesses, atrophy or joint deformity which would limit her activities. (D00457.) Dr. Roth also noted she recovered well from her right shoulder surgery. (*Id.*)

Plaintiff attests that the only testing of functional capacity performed by Dr. Roth was a heal toe walk test and that she lost her balance during this test. (D00419.) She also attests that Dr. Roth did not apply as much pressure during the palpation test as other doctors who have performed the same test.

Dr. Roth issued an Addendum to his report on July 28, 2009. (D00458.) He clarified Plaintiff did not have difficulty with mobility; was able to ambulate without assistive device;

able to toe and heel walk without weaknesses; had good communication and cognition skills and was able to perform self-care and community mobility without difficulty. (D00459.) He opined Plaintiff required no restrictions or limitations regarding her ability to sit, stand, walk, reach, lift, carry, grip, grasp, pinch or perform repetitive and fine motor activities. (*Id.*) Plaintiff objects to these findings, arguing that Dr. Roth ignored her neck condition and did not perform a functional status assessment or test her ability to sit, stand, lift, carry, reach, grip, grasp, pinch, or perform repetitive and fine motor hand activities.

On July 23, 2009, Plaintiff had a motor nerve, sensory nerve and EMG study, which suggested right C5-C6 radiculopathies, as well as bilateral carpal tunnel syndrome. (D00138-39.)

Plaintiff had an MRI of the left knee on July 25, 2009. (D00136.) The impression of this study states: "Marrow edema within the posterior central tibial plateau as either chronic degenerative fibrovascular reaction, stress injury and/or stress change, or osseous contusion or microtrabecular bone injury if patient has sustained recent trauma. No macro-fracture." (*Id.*)

On August 6, 2009, Prudential terminated Plaintiff's LTD benefits effective August 31, 2009, based on the results of Dr. Roth's independent medical examination. (D001033.)

On August 12, 2009, Prudential informed Plaintiff she was not eligible to receive continuation of Group Life Insurance benefits under the waiver of premium. (D0027.) Prudential concluded the medical information failed to show she was totally disabled as required under the policy. (D0028.)

Plaintiff appealed Prudential's decision to terminate LTD benefits and waiver of life insurance premiums by letter dated August 13, 2009, and requested all the evidence used

by Prudential in deciding this matter.  (D001.)  Plaintiff asked Prudential not to take any action until she had had the opportunity to supplement the record.  (D002.)

A note dated August 27, 2009 from Dr. Parveen Qazi, Rheumatologist, indicates Plaintiff had been diagnosed with generalized osteoarthritis and fibromyalgia/chronic fatigue syndrome; sleep disturbance; carpal tunnel syndrome and cervical radiculopathy. (D00134.)  He opined Plaintiff had difficulty performing household chores, lifting objects up to 10 lbs in weight and difficulty combing her hair.  (D00135.)

Dr. Ciullo's note for September 1, 2009, 11 months after her surgery, indicates Plaintiff continued to experience pain in her shoulder notwithstanding physical therapy and having regained her motion.  (D00132.)  The physical exam demonstrated there was a little deltoid atrophy, which according to the physician, may explain fatigue.  The x-rays showed that her neck "has extensive degenerative changes with a flattening of C4 through C7 and collapsed of disk space between C5 & C6.  This could explain the lack of innervation to the deltoid muscle and the weakness she is feeling."  She appeared to be positive for Spurling maneuver and possibly affected by arthritis.  Dr. Ciullo recommended a functional capacity assessment but believed her neck x-ray and clinical exam supported the findings.  He opined Plaintiff had a deficit, which may be due to the cervical radiculopathy, and the functional capacity assessment would confirm her status.

On September 4, 2009, Dr. Rottenberg authored and addressed a letter to Plaintiff's counsel summarizing her conditions.  (D00129.)  Plaintiff complained of decreased sitting tolerance with, at times, severe back and lower back pain.  (D00130.)  Plaintiff had spine x-rays that day which showed "significant disc space narrowing at L4-5 and L5-S1 with a swayback deformity as well as some facet osteoarthritic changes in the lumbosacral spine."

(*Id.*)  Dr. Rottenberg opined Plaintiff was "permanently and totally disabled with regards to return to work."  (*Id.*)  He opined Plaintiff would be unable to perform any overhead work due to her neck problems; would need to avoid any repetitive or prolonged twisting and turning of her head and neck; would be unable to raise or maintain her upper extremity at or above shoulder height; avoid constant and repetitive gripping or squeezing using her wrists and hand; and repetitive use of keyboard because of her carpal tunnel syndrome. (*Id.*)  Moreover, Dr. Rottenberg indicated Plaintiff had limitations in her ability to tolerate standing and walking due to left knee pain and sitting due to her neck and back condition, which would require frequent adjustment at least on an hourly basis.  (*Id.*)  He also assessed Plaintiff had obvious attention deficit problems and reduced endurance because of her hypothyroidism and chronic fatigue syndrome, which require frequent rest periods. (D00131.)  Dr. Rottenberg indicated x-rays taken on March 17, 2009, and the office visit of same date showed Plaintiff had a reversal of cervical lordosis with a minimal C4 on C5 retrolisthesis with disc space narrowing at C3-4 with some mild C5-6 disc space narrowing. (D00129.)  The x-rays of her right shoulder taken on the same date also showed some subacromial narrowing with limited abduction as well as what appeared to be a good Mumfored gap with the patient having a history of prior surgical decompression for a right shoulder impingement syndrome with rotator cuff problems.  (*Id.*)  The x-rays of the left knee showed "a decrease in the medial joint space with patellofemoral narrowing as well as some mild medial displacement of the left patella."  (*Id.*)

On September 4, 2009, Plaintiff had an MRI of the cervical spine which showed mild multilevel degenerative arthrosis with straightening of the cervical lordosis and mixed soft disc spondylotic abnormalities at C3-4, C4-5, C5-6, C6-7 and C7-T1 levels as well as

unconvertebral hypertrophic degenerative changes, resulting in mild to moderate left-sided existing neural foraminal stenosis at the C3-4 level, mild to moderate bilateral existing neural foraminal stenosis at the C4-5 level, as well as mild right-sided existing neural foraminal stenosis at C5-6 level, and mild bilateral existing neural foraminal stenosis at C6-7 level.  (D00128.)

Plaintiff had a CT scan of the chest on January 12, 2010.  (D00121.)  This study showed findings of bronchiectasis in the right upper lobe with some parenchymal linear opacities and nodular densities in the right lung and prominence of the biliary ductal system in the liver.  (D00122.)  Follow up for the lung nodules and further evaluation of the liver and pancreas was recommended.  (*Id.*)

Plaintiff executed an affidavit on February 11, 2009.  (D00414.)  In this document she gave a summary of her medical conditions; the treatment received; the symptoms; her work history, including the duties of her position at DAAA; the medications prescribed and taken and their effect.  (D00414-19.)

On February 15, 2010, Plaintiff submitted additional documentation in support of her appeal and appealed the waiver of premium benefits.  (D00390.)

On March 22, 2010, Dr. John LoCascio, Prudential's VP and Medical Director, Board Certified in Internal Medicine, rendered a report after reviewing Plaintiff's medical records.  (D00924.)  He concluded "in view of the surveillance and lack of objective impairment, minimal impairment [wa]s supported, primarily related to the known shoulder surgery and possibly related to the CTS."  (D00929.)  He opined further that Plaintiff's diagnoses were largely irrelevant in assessing her functional impairments, since "[m]any people with diagnoses have no functional impairment and, a few people with obvious functional

impairment have no clearly established diagnosis." (*Id.*) Dr. LoCascio concluded Plaintiff probably had the functional ability to perform sustained work activities on a regular and full-time basis at any level, "but in view of the multiple, contradictory aspects of the history of this file, no final conclusions can be drawn at this time." (D00930.)

On April 26, 2010, Dr. LoCascio issued another opinion based on the information available at the time. (D00915.) He concluded Plaintiff was not functionally impaired at the time and recommended full functioning based on her clinical examination and the history taken, which was essentially normal except for the subjective complaints of pain and numbness. (D00917.) He also opined Plaintiff did not suffer any cognitive deficits from her medication. (D00918.) He recommended the assessment of Plaintiff's psychological conditions. (*Id.*) Dr. LoCascio believed the record only supported impairment due to her shoulder operation and the sedation from opiates, both of which were for closed periods of time. (*Id.*) He opined further the surveillance video demonstrated the preservation of Plaintiff's gross motor, fine motor and cognitive functions; the failure to show guarding and avoidance behaviors, typical of a person with multiple severe conditions and demonstrated sustained activity of an hour in one occasion and an hour and fifteen minutes on another. (D00920-21.) He concluded that, "to a reasonable degree of medical probability, the data support[ed] the ability to sustain full-time [s]edentary activity. [Plaintiff] may be capable of supporting a higher level of activity, but I cannot clearly define this based on the currently available data." (D00922.)

On April 28, 2010, Prudential conducted Plaintiff's employability assessment. (D00913.) The transferability skills analysis revealed the following sedentary positions

Plaintiff could perform: eligibility worker; residence supervisor ($20.34/hr); employment clerk ($20.07/hr); job development specialist ($27.81/hr).  (D00914.)

On April 30, 2010, Prudential upheld its decision to terminate Plaintiff's LTD benefits. (D001021.)  It concluded that despite of her medical conditions, Plaintiff retained at least full time sedentary capacity.  (D001026.)  Moreover, the record also documented that Plaintiff's conditions were due, at least in part, to mental illness related to either psychosocial impairment or somatoform disorder.  Her claim is thus subject to a 24-month limitation.  (*Id.*)  Prudential concluded that the medical evidence did not support an impairment to perform the duties of at least a sedentary level occupation.  (*Id.*)  Also, the evidence showed Plaintiff was reasonably fitted to perform several sedentary level occupations, including her occupation, based on her education, training and experience. On May 3, 2010, Prudential upheld its decision that Plaintiff was no longer considered eligible for the waiver of premium benefit.  (D0021.)

On November 16, 2010, Dr. Brian McCarroll, family physician, issued a letter "To Whom It May Concern," opining Plaintiff's disability benefits should be restored.  (D00334.) On December 1, 2010, Plaintiff appealed Prudential's decision to terminate LTD benefits and waiver of premium benefits on April 30, 2010 and May 3, 2010, respectively. (D00312.)

On January 6, 2011, Dr. Howard Choi, Board Certified in Physical Medicine and Rehabilitation, rendered his opinion.  (D00293.)  He concluded Plaintiff had restrictions and limitations from September 1, 2009, due to a combination of medical conditions consisting of cervical degenerative changes, right shoulder degenerative changes and bilateral carpal tunnel syndrome.  (D00306.)  Dr. Choi recommended limitations and restrictions from

medium classification or more demanding work, specifically from continuous work involving wrists and hands.  (*Id.*)  However, according to Dr. Choi, Plaintiff would be able to perform "full time light work with short, occasional (every 20-30 minutes) breaks from physical activity involving her hands as needed when symptomatic.   These restrictions were indefinite unless Plaintiff underwent surgical release of her carpal tunnels.   No restrictions concerning sitting, standing, walking, reaching, lifting or carrying beyond those consistent with a light physical demand occupation, including no lifting more than 20 pounds occasionally or 10 pounds frequently and no standing or walking more than 6 hours per day, were imposed.  (*Id.*)  Dr. Choi opined the record did not support Plaintiff's reported limitations, particularly after reviewing the surveillance video, which showed her moving the head and the neck, using her arms and ambulating in a normal matter without any signs of difficulty.  (D00307.)  Dr. Choi concluded the record did not show significant adverse side effects from any medication or combination of medications as supported by Plaintiff's ability to drive regularly.  (*Id.*)

Dr. Frank Polanco, Board Certified in Occupational Medicine, rendered his report on January 6, 2011.  (D00256; D00273.)  He also concluded Plaintiff needed permanent restrictions and limitations to her functions from September 1, 2009 forward, including "no overhead work, no heavy lifting (no greater than 20 pounds) and no lifting overhead.   No prolonged standing or walking (no greater than 33% of time.)  No repetitive hand activities (no greater than 33% of time.)  She would be afforded the ability to change positions as needed for comfort."  (D00270.)  Dr. Polanco opined Plaintiff's conditions affected her ability to maintain static postures for extended periods of time and perform repetitive activities with her hands, sit, stand, walk, reach, carry and perform upper extremity activities.  (D00270-

71.)  Notwithstanding this, he believed Plaintiff had functional capacity at the light level on a regular full time basis with the restrictions he noted.  (D00271-72.)  He concluded Plaintiff's alleged inability to sit for more than 15 minutes before needing to lie down; limited standing and walking; no constant or repetitive use of her upper extremities for gripping, keyboarding or squeezing, were not supported by the medical records.  (D00272.)  Also, no side effects from her medications were supported.  (*Id.*)

Dr. Mark R. Burns, Board Certified in Internal Medicine with a Specialty Certificate in Rheumatology, issued his report on January 6, 2011.  (D00275; D00291.)  He stated Plaintiff needed the following restrictions and limitations from September 1, 2009, forward: take breaks from repetitive hand motions due to numbness/tingling (long enough until symptoms resolve) and limit lifting and carrying to 20 pounds occasionally.  (D00289.)  He imposed no restrictions to sitting/standing/walking and stated Plaintiff had the ability to reach above the shoulder.  (*Id.*)  He opined the restrictions concerning the carpal tunnel syndrome would last until she had surgery or the symptoms resolve spontaneously but the lifting and carrying restriction were permanent.  (*Id.*)  He concluded Plaintiff's self-reported limitations, including cognitive limitations, were not supported by the record or the surveillance video reviewed.  (D00290.)  He opined the record did not support a finding that Plaintiff had any side-effects from the medications she was taking.  He concluded Plaintiff was able to perform full time work with the restrictions and limitation he recommended.

On January 14, 2011, Prudential updated Plaintiff's vocational analysis in light of the new evidence in file, including the following restrictions and limitations: no overhead lifting and reaching; lifting to 20 pounds occasionally and/or 10 pounds frequently; up to occasional standing/walking, ability to alter position while seated; occasional

handling/fingering.  (D00889.)  The study concluded the only position from those previously identified within the restrictions and limitations was Job Development Specialist.  (D00890.) The new search conducted showed the following positions to be within the specified restrictions and limitations: Information Clerk ($12.69 per/hr) and Gate Guard ($11.90 per hour).

On January 14, 2011, Prudential denied Plaintiff's second appeal.  (D001000.)  It concluded, based on the opinions of the three peer reviewers, and the vocational review previously conducted, Plaintiff retained up to light duty capacity with the restrictions and limitation imposed.  (D001005.)  Plaintiff was thus considered to be able to perform the duties of several gainful occupations based on her education, training and experience, as identified in the transferable skills analysis.  (*Id.*)

On January 18, 2011, Prudential denied Plaintiff's waiver of premium claim. (D0016.) Prudential concluded the record failed to show she was precluded from working at any job as required to be eligible to receive this benefit.  (D0018.)

## ANALYSIS

This matter is before the court on the parties' cross motions for entry of judgment on the administrative record.  When a benefit plan accords discretionary authority to the claims administrator to make determinations with respect to benefits eligibility, the administrator's determination is subject to the "arbitrary and capricious" standard of review. Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir. 2006).  The Plan at issue in this case states that disability benefits begin "when Prudential determines" the criteria have been satisfied and shall stop sending payments and end a claim, *inter alia*, on "the date [the participant] fail[s] to submit proof of continuing disability satisfactory to Prudential."  The Sixth Circuit

has held that language similar to this is sufficient to grant discretion to the administrator. See Cooper v. Life Ins. Co. of N. Am., 486 F.3d 157 (6th Cir. 2007) ("'satisfactory proof of disability" is sufficient to grant discretion and warrant the abuse of discretion standard of review); Yeager v. Reliance Std. Life Ins. Co., 88 F.3d 376, 380-81 (6th Cir. 1996) (claimant must submit "satisfactory proof of Total Disability to us"); Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 983 (6th Cir. 1991) (disability determined "on the basis of medical evidence satisfactory to the Insurance Company"); Noland v. The Prudential Ins. Co., 187 Fed. Appx. 447 (6th Cir. 2006) (holding that the language "when Prudential determines" reserves discretion: "Prudential's plan reserves for itself the discretion to make factual determinations. The plan states that benefits are granted only 'when Prudential determines that all of these conditions are met'…Such language reserves discretionary authority to Prudential."). While Plaintiff argues  the Plan does not grant discretion to the plan administrator, Plaintiff fails to distinguish the cases on point or address the specific Plan language.  Prudential's decision to terminate benefits is therefore reviewed under the arbitrary and capricious standard.

Plaintiff bears the burden of proof to show her disability under the terms of the Plan. See Rochow v. Life Ins. Co. of North America, 482 F.3d 860, 865 (6th Cir. 2007).  Under the arbitrary and capricious standard of review, the plan administrator's determination must be upheld so long as it is "rational."  Schwalm v. Guardian Life Ins. Co. of America, 626 F.3d 299, 308 (6th Cir. 2010).  A decision is not arbitrary and capricious if it results from "a deliberate principled reasoning process" and is supported by "substantial evidence."  Baker v. United Mine Workers of Am. Health & Ret. Funds, 929 F.2d 1140, 1144 (6th Cir. 1991).

-24-

In a very conclusory manner, Prudential argues its decisions to terminate Plaintiff's LTD benefits and waiver of premium benefits were supported by substantial evidence and resulted from deliberate and principled reasoning processes. Prudential argues it relied on the IMEs, peer review reports, and the surveillance videos. Prudential states the peer review reports and IME physicians chronicle Plaintiff's medical history and treating physicians' records and create a list of restrictions and limitations based on Plaintiff's medical conditions/diagnoses. The peer reviewers with specialties in physical medicine and rehabilitation, occupational medicine and rheumatology, along with Prudential's vocational assessment, concluded Plaintiff was able to engage in other positions for which she was reasonably qualified based on her education, training and experience. Prudential argues that, while Plaintiff does have certain medical conditions, her conditions do not prevent her from working at any gainful occupation. Prudential has identified several occupations that it believes Plaintiff can perform within the parameters of the plan.

In her motion for judgment on the record and in response to Prudential's motion, Plaintiff asserts a number of problems with Prudential's termination of her benefits. First, Plaintiff alleges Prudential violated ERISA procedures when it updated her vocational analysis at the final stage without giving her an opportunity to respond. Second, Plaintiff argues Prudential's explanation for the termination of benefits is not consistent with the quality and quantity of the record evidence. Finally, Plaintiff notes Prudential's failure to distinguish the Social Security Administration decision awarding her benefits for total disability.

First, Plaintiff argues Prudential violated § 1133 of ERISA when it updated her vocational analysis. 29 U.S.C. § 1133 provides:

>In accordance with regulations of the Secretary, every employee benefit plan shall -
>
>(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
>(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

The Sixth Circuit applies a "substantial compliance" test to determine whether the notice requirements have been met. See Sanford v. Harvard Indus., Inc., 262 F.3d 590, 598 (6th Cir. 2001).

When Prudential updated Plaintiff's analysis on January 14, 2011, it concluded that the only position from those previously identified in April 2010 within the new restrictions and limitations was Job Development Specialist. It then performed a new search showing two additional positions, Information Clerk or Gate Guard, within the specified restrictions and limitations. Plaintiff argues that by switching the occupations, Prudential denied her the opportunity to appeal the assertion that she was capable of performing as an Information Clerk or Gate Guard. She did not have the opportunity to challenge the assertion that she is physically able to do those jobs nor to address any education and training requirements for those jobs. The same day that Prudential updated her vocational analysis, it denied her second and final appeal. She therefore asserts she has not been afforded an opportunity for a "full and fair review" by Prudential. Prudential argues she was not prejudiced by the addition of the two new jobs because one job had been previously identified.

-26-

If the court finds a violation, Plaintiff argues reinstatement is appropriate and Prudential argues Plaintiff should simply be given the opportunity to submit additional evidence in this proceeding.  In University Hospitals of Cleveland v. South Lorain Merchants Ass'n Health & Welfare Benefit Plan and Trust, 441 F.3d 430, 434 (6th Cir. 2006), the Sixth Circuit explained that allowing the plaintiff to submit additional evidence is the proper remedy for a procedural violation rather than changing the standard of review of the administrator's decision.  However, the University Hospitals of Cleveland case did not involve *termination* of benefits.  In Sanford, 262 F.3d at 599, the Sixth Circuit observed that when an initial grant of benefits has been terminated in violation of § 1133, the benefits have "never been properly revoked" and so the benefits "should continue until a decision regarding the potential revocation of...benefits has been properly determined in compliance with the plan's provisions."  Thus, Plaintiff argues the court should vacate the termination of her benefits and direct Prudential to retroactively reinstate benefits, to return to the status quo prior to termination by improper procedures.

Second, Plaintiff attacks the substance of Prudential's termination of benefits as conflicting with the opinions of her treating physicians.  A plan administrator need not "accord special deference to the opinions of treating physicians" and courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831, 834 (2003).  However, "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of 'not disabled' in order to save their employers money and preserve their own consulting arrangements.'"  Id. at 832. When a plan administrator both decides claims and pays benefits, it has a "clear incentive"

-27-

to contract with consultants who are "inclined to find" that a claimant is not entitled to benefits. Kalish v. Liberty Mutual/Liberty Life Assurance, 419 F.3d 501, 508 (6th Cir. 2005). "Thus, although 'routine deference to the opinion of a claimant's treating physician' is not warranted, we may consider whether 'a consultant engaged by a plan may have an 'incentive' to make a finding of 'not disabled'' as a factor in determining whether the plan administrator acted arbitrarily and capriciously in deciding to credit the opinion of its paid, consulting physician." Id.[1]

"Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." Burge v. Republic Engineered Prods., Inc., 432 Fed. Appx. 539, 550 (6th Cir. 2011) (internal quotations and citation omitted). However, "giving greater weight to a non-treating physician's opinion for no apparent reason lends force to the conclusion that a plan administrator's decision is arbitrary and capricious." Curry v. Eaton Corp., 400 Fed. Appx. 51, 59 (6th Cir. 2010).

Moreover, "[t]he mere possibility that a participant in an ERISA plan might be able to return to some type of gainful employment, in light of overwhelming evidence to the contrary, is an insufficient basis upon which to support a plan administrator's decision to deny that participant's claim for LTD benefits." McDonald v. Western-Southern Life Ins.

---

[1]The parties' submissions do not make clear whether Prudential both decides and pays the benefits and there is no evidence in the record that the physicians retained by Prudential were repeatedly retained by Prudential to render opinions.

Co., 347 F.3d 161, 172 (6th Cir. 2003). "It is not enough for [the plan administrator] to offer an explanation for the termination of benefits; the explanation must be consistent with the 'quantity and quality of the medical evidence' that is available on the record." Moon v. Unum Provident Corp., 347 F.3d 373, 381 (6th Cir. 2005).

Here, Plaintiff argues the explanation provided by Prudential, that its reviewing physicians found no limitations that would preclude her from working, is not consistent with the quantity and quality of the medical evidence on the record. She argues there is no evidence, other than a cursory IME, supporting the reviewing physicians' opinions that she can work on a regular basis. In contrast, her inability to work full-time is established through years of hands-on examination, objective medical tests, and clinical evidence. On August 27, 2009 Dr. Qazi examined Plaintiff and noted a number of medical problems, including back and knee issues, and resulting limitations. On September 1, 2009, Dr. Cuillo noted x-rays showing Plaintiff's neck "has extensive degenerative changes with a flattening of C4 through C7 and collapsed of disk space between C5 & 6. This could explain the lack of innervation to the deltoid muscle and the weakness she is feeling." Dr. Rottenberg, who had been treating Plaintiff for 3 ½ years, opined that Plaintiff is unable to work full-time. He indicated Plaintiff had limitations in her ability to tolerate walking and standing due to knee pain and sitting due to her neck and back condition. He indicated x-rays supported his findings regarding Plaintiff's conditions. On November 16, 2010, Dr. McCarroll opined Plaintiff is unable to work full-time because of her chronic pain syndrome and the side effects of her therapeutic medications based on his 3-plus years of treating Plaintiff. Plaintiff argues the opinion that she cannot work is supported by opinions from her doctors finding that she is limited in her ability to sit, to use her fingers and hands, and to walk and

-29-

stand for extended periods, and that she tends to become drowsy due to her medication and sleep apnea. Plaintiff thus argues Prudential did not act rationally in finding she could perform sedentary work.

Plaintiff contends Dr. Roth's findings are contrary to the medical documentation and the opinions of her treating providers. She contests Dr. Roth's finding that there was no evidence of cervical radiculopathy. She states the July 23, 2009 EMG showed right C5-C6 cervical radiculopathies and that Dr. Roth made his conclusion without performing a Spurling maneuver test during the IME, a test that can suggest cervical radiculopathy. She also criticizes Dr. Roth's finding that her carpal tunnel syndrome does not limit her functioning. She also argues Dr. Roth failed to address her neck condition. Prudential fails to address these concerns in its briefs.

Plaintiff also argues Prudential refused to acknowledge Plaintiff's pain complaints which are supported by objective evidence (diagnoses of conditions that can cause pain and repeated injections and pain medication to deal with the pain). Plaintiff argues Prudential's selective review of the records in determining there was no objective evidence of pain is arbitrary and capricious. See Ebert v. Reliance Standard Life Ins. Co., 171 F. Supp. 2d 726, 739-40 (S.D. Ohio 2010) (where there was evidence of physical conditions which could reasonably cause pain, it was a "complete misreading of the medical records...to say that Plaintiff's complaints of pain or weakness...are subjective and unverifiable.") Plaintiff also argues that any credibility determinations as to her subjective complaints made without the benefit of a physical examination should not be relied upon.

Plaintiff asserts Prudential improperly relied on the surveillance video, which Prudential characterizes as conflicting with her self-reported limitations. The surveillance

video shows Plaintiff walking, driving, and manipulating bags, grocery carts, and her car door handle and steering wheel.  However, Plaintiff's actions in the video are very limited; her movements are slow, stiff, and guarded.  The video appears reasonably consistent with her own statements concerning her limitations.

Finally, Plaintiff notes Prudential's failure to distinguish the Social Security Administration decision awarding her benefits for total disability.  Prudential's failure to distinguish the SSA's determination of total disability is meaningful.  In DeLisle v. Sun Life Assurance Co., 558 F.3d 440, 444 (2009), the Sixth Circuit explained that the court considers the plan administrator's consideration of the Social Security Administration determination in reviewing a plan administrator's decision.  The Sixth Circuit found:

> Although there is no technical requirement to explicitly distinguish a favorable Social Security determination in every case, '[i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious.'"

Id. at 445, quoting Bennett v. Kemper Nat'l Servs., 514 F.3d 547, 554 (6th Cir. 2008). Here, Prudential required that Plaintiff apply for Social Security disability payments, financially benefitted from her receipt of Social Security, and yet gives no explanation for taking a different position from that of the SSA.  While Prudential notes that the SSA's award of benefits was more than 3 years prior to the termination of benefits at issue in this case, and argues a different legal standard was employed, Prudential fails to distinguish the SSA decision or provide a legitimate reason for why it should not be considered here. This weighs in favor of a finding that Prudential's decision was arbitrary and capricious.

While Prudential does not have to agree with Plaintiff's four treating physicians, Prudential's decisions must be consistent with the "quantity and quality of the medical evidence" on the record.  Here, Prudential fails to address Plaintiff's specific arguments and thus fails to show how its termination decisions are consistent with the record evidence. For the combination of reasons asserted by Plaintiff, this court finds Prudential's termination decisions are arbitrary and capricious.  The court therefore grants Plaintiff's motion for judgment on the administrative record.

The court exercises its discretion in denying both parties' requests for attorneys fees and costs pursuant to 29 U.S.C. § 1132(g).

CONCLUSION

For the reasons set forth above, the court GRANTS Plaintiff's motion for judgment on the record and DENIES Defendant's motion for judgment on the record.

Dated:  September 28, 2012

s/George Caram Steeh

GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on September 28, 2012, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---